

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-16-00160-CR

KIRK BARRILLEAUX                                                          APPELLANT

V.

THE STATE OF TEXAS                                                              STATE

----------

### FROM THE 297TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1415868D

----------

## MEMORANDUM OPINION[1]

----------

Sporting on his red Dodge Durango a rear-window sticker reading "Does Not Play Well With Others," Kirk Barrilleaux found himself embroiled in a road-rage incident. After hearing the evidence, a jury found him guilty of aggravated assault with a deadly weapon, and the trial court sentenced him to ten years in the penitentiary. In a single point, Barrilleaux argues that he was the road-rage

---

[1]*See* Tex. R. App. P. 47.4.

incident's victim and not its perpetrator and thus contends that the evidence is insufficient to support the conviction. We affirm.

## Barrilleaux attacks the evidentiary sufficiency

In his only point, Barrilleaux argues that the evidence is insufficient because the State failed to prove beyond a reasonable doubt that he used or exhibited a firearm. Barrilleaux further contends that all the evidence contradicted the complainant's assertion that Barrilleaux displayed or discharged a firearm in the complainant's direction. In a statement to a detective shortly after the incident, Barrilleaux maintained that the complainant was the aggressor and denied displaying or discharging a firearm.

## Standard of review

In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the offense's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599. The factfinder alone judges the evidence's weight and the witnesses' credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016).

2

Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the factfinders' weight-and-credibility determinations and substitute our judgment for theirs. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any conflicting inferences in the verdict's favor and must defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33. The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

**Discussion**

On September 17, 2014, Auston Green was driving on Interstate 35, heading to his 12:30 p.m. class at Tarrant County College's South Campus, when he saw a red Dodge Durango SUV pull up behind him so rapidly that he thought the Durango was going to hit him. Green took the usual exit from I-35 onto Interstate 20 toward TCC, but when the Durango continued to follow him, Green decided to get off of I-20 ahead of the Campus Drive exit for TCC and turned on his right-turn blinker. When the Durango did the same, Green revised his plan and remained on I-20 instead; the Durango continued to follow him. Green next tried to lose the Durango by moving over into the left-hand lanes, but the Durango remained on his bumper.

3

Suddenly the Durango managed to get in the lane to Green's left and sped up to pass him. As Green glanced to his left, he saw a male pointing a black gun at him. As the Durango passed him, the man fired his gun at Green, but Green added that everything happened so fast, he was not sure at what point the man fired. Moments later Green felt a stinging and burning sensation in his shoulder and noticed that he was bleeding.

Green called 911. He admitted at trial having told the 911 dispatcher that the shooter was on his right side, but he explained that he was wrong and attributed the mistake to "adrenaline." Having never been shot before, he said he was "scared" and "in shock."

Meanwhile, the Durango quickly changed lanes and exited on the right onto Campus Drive—the same exit Green needed to take to get to his class—so that the two men now ended up at the same exit. While Green was on the phone, he was able to see and pass along the Durango's license plate number to the 911 dispatcher. He was also able to describe a sticker on the Durango's back window: "Does Not Play Well With Others."

Later that afternoon, using the Durango's license plate number, the police were able to track it down at a Walmart in Crowley. When Barrilleaux came out of the Walmart and started to get into the Durango, the police arrested him without incident. The arresting officer could see a gun on the passenger side of the car.

A detective interviewed Barrilleaux that same afternoon. Barrilleaux did not deny the encounter with Green but maintained that he was the victim and that

4

Green was the road-rage perpetrator. Barrilleaux stated that Green cut him off while he was driving northbound on I-35 before the I-20 exit, told him to "eff off," made an obscene physical gesture at him, and threw items—including a water bottle—out the window at him. Barrilleaux denied displaying or discharging a weapon. The police checked Barrilleaux for gunshot residue around 2:43 that same afternoon but found none.[2]

The next day, after procuring a search warrant, the police searched Barrilleaux's Durango and found a black Hi-point .45 caliber automatic pistol under the floor mat. The gun contained five cartridges in its nine-cartridge magazine and one inside the gun's chamber. Also on the floorboard was a glove, and a towel was on one of the seats.

Green was driving a convertible, and he testified that before this incident, his car did not have any bullet holes; now, however, it did—on the left side. The canvas top had a hole in the fabric, the metal frame that supported the canvas

___

[2]When waiving his *Miranda* rights, Barrilleaux signed the waiver with his right hand. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); *see also* Tex. Code Crim. Proc. Ann. art. 38.22 (West Supp. 2017). Later when an officer came in to check Barrilleaux for gunshot residue and asked him if he was left- or right-handed, Barrilleaux responded that he was left-handed, so the officer daubed Barrilleaux's left hand with an adhesive designed to pick up traces of gunshot residue. Apparently out of an abundance of caution, the officer also daubed Barrilleaux's right hand. Immediately before the officer checked Barrilleaux for gunshot residue, Barrilleaux denied that the police would find any. After the officer checked both hands for gunshot residue, Barrilleaux disclosed that he had fired a shotgun while shooting skeet earlier that morning.

had a quarter-sized hole going into it and a hole coming out of it, and the driver's-side headrest had both entrance and exit holes.

Using a trajectory rod, the police thought the bullet initially came into the canopy from the back and behind the seat, then traveled forward and slightly downward until it hit the headrest—a trajectory from back to front and not from side to side. Said one officer, "When a bullet strikes an object, there's not really any way to tell exactly where it's going to go." It could thus "come from a side. It could come from a glancing. Once a bullet begins to strike objects, especially solid objects, it changes the trajectory completely." Consequently, "The trajectory rod is basically an estimate or a great idea, but it doesn't tell exactly. You're going to have parts of whatever that bullet hit going through as well."

The police found no bullet in the car, but the windows were down, so it was possible that the bullet had exited through an open window. It was also possible that what went through the headrest was not a bullet but a fragment from the frame. One officer acknowledged that it was possible that the holes in Green's car were not actually bullet holes at all.

The officer who saw Green in the hospital said that initially he did not think it looked like a "direct" gunshot wound. But after evaluating all the evidence, the officer said, "Looking at everything, his wound was more than likely a result of a gunshot." He explained, "[Y]ou don't have to be hit by a bullet to be shot" and that Green's injury could have been caused by a bullet fragment or a piece of something else.

Green described his injury as a "gouge" to his shoulder with a "pit in the middle" where a chunk of skin was missing. The injury did not require any stitches, and he was not prescribed any pain medication, but Green testified that his shoulder was sore for another two or three weeks.

As viewed in the light most favorable to the verdict, the evidence was this: Green said the driver of a specifically identified Durango fired a black gun at him; later that same afternoon, the police arrested Barrilleaux in the same Durango and found a black gun in it. Green's car showed damage that the police had no difficulty identifying as coming from a bullet. Although an officer acknowledged that it was possible that something other than a bullet could have caused the damage, given the other evidence before the jury that possibility seemed unlikely. And Green had a wound on his shoulder that was consistent with getting hit with a bullet fragment or from some other fragment propelled by a bullet. The jury decides a witness's credibility, and the verdict reflects that the jury believed Green. We may not re-evaluate that determination. *See Blea*, 483 S.W.3d at 33; *Montgomery*, 369 S.W.3d at 192.

Barrilleaux further contends, however, that the other evidence contradicted Green's testimony. We disagree. Although it is true that no gun powder residue was found on Barrilleaux's hands, other factors might explain the absence of residue, not the least of which were the glove and the towel found in the Durango. And although it is also true that Green described the shooter as being on his right side during the 911 call, Green testified that he was mistaken and

7

attributed his mistake to the adrenaline rush of having been shot. Finally, although the trajectory rod showed a bullet path ostensibly inconsistent with Green's testimony, the testimony was also that a trajectory rod is not infallible. Regardless of the trajectory, the jury could have reasonably concluded that Barrilleaux fired his weapon at Green and thereby injured him. Ultimately, we must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *See Murray*, 457 S.W.3d at 448.

Viewing the evidence in the light most favorable to the verdict, we hold that a rational factfinder could have found that Barrilleaux intentionally or knowingly caused bodily injury to Green by shooting him and that Barrilleaux used or exhibited a deadly weapon—a firearm—while committing the assault in a manner that was capable of causing death or serious bodily injury. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599. We overrule Barrilleaux's sole point.

## Conclusion

Having overruled Barrilleaux's sufficiency challenge, we affirm the trial court's judgment.

8

/s/ Elizabeth Kerr
ELIZABETH KERR
JUSTICE

PANEL:  WALKER, KERR and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  February 22, 2018